**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PETROS KAPOTAS AND** | : | |
| **PERSEFONI KAPOTAS, H/W,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **No. 2:24-cv-01995** |
| | : | |
| **CTP FUNDING, LLC.** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**MEMORANDUM OPINION**

**August 6, 2025**

## I.   INTRODUCTION

Plaintiffs, Petros Kapotas and Persefoni Kapotas (collectively, Plaintiffs), bring several claims against Defendant, CTP Funding, LLC (Defendant/Capstone Financial), related to their mortgage agreement and the associated construction loan. Before the Court is Defendant's Motion for Summary Judgment (Dkt. 29).  For the following reasons, Defendant's Motion is granted with respect to all Plaintiffs' claims and judgment is hereby entered in favor of Defendant.

## II.    BACKGROUND

The following facts are not subject to genuine dispute.[1]  Plaintiffs executed an Interest-Only Period Fixed Rate Note with Defendant on April 6, 2023.  *See* Dkt. 30 at ¶ 1.  This provided Plaintiffs with a loan from Defendant in the amount of $576,5000 (Loan).  *See id.*  To secure the Loan, Plaintiffs executed a mortgage against real property located at 1939 W. Diamond St., Philadelphia PA, 19121 (Property).  *See id.* at ¶ 2.  The parties intended for the Loan to operate as a construction loan, in which a majority of the funds were to be used to pay off an existing loan Plaintiffs had with Defendant and the remaining funds were to be used for construction and renovations on the Property.  *See id.* at ¶¶ 4-5a, 6.  The Settlement Statement allocated the funds as follows: "$406,537.78 was to be released at the Loan's closing, while $131,500.00 was to be withheld by Defendant" and used for renovations as needed by the Plaintiffs.  *Id.* at ¶¶ 7-8.

Plaintiffs listed their company, Kapotas Construction, as the general contractor to perform the construction and renovations on the Property.  *See id.* at ¶ 54.  Upon Plaintiffs' submission of a proper draw request, Defendants would release

---

[1]    The factual citations here are to Defendant's Statement of Undisputed Material Facts, which parties submitted jointly. (Dkt. 30; *see also* Dkt. 33 at 2). Plaintiffs dispute some of these factual allegations.  For the sake of clarity, to the extent any factual assertion from Defendant's Statement cited by this Court was disputed in Plaintiffs' responsive statement, the Court has carefully reviewed and overruled Plaintiffs' disputes if that dispute is inconsistent with the factual basis for which the Court cites it.  The basis for overruling the disputes is that this Court did not find the additional facts pleaded to be relevant for the purposes for which they were cited.  This Court does not rely on any factual assertion about which the Court has found a genuine dispute of material fact.

funds based on Rehabilitation/Renovation Budget (Rehab Budget) and Rehab Draw Guidelines (collectively, the Guidelines). *See id.* at ¶ 6.

As a part of the underwriting process, Plaintiffs agreed to Defendant's Rehab Budget and Rehab Draw Guidelines. *See id.* at ¶ 9. The Guidelines establish the draw request protocol as follows:

> [i]n order to fund renovation draws or escrow releases, the Capstone Financial will engage a property inspector satisfactory to Capstone Financial to ensure that the budgeted rehab work has been completed prior to releasing funds. [2] The borrower will be responsible for the cost of all inspections and Capstone Financial['s] out of pocket costs related to the draw review and release of funds. The borrower must complete a draw request on a Capstone Financial approved form and supply invoices for the line items that the draw is to cover. Capstone Financial will compare the draw request and invoices against the inspection report to confirm that the work has been completed for the requested draw. The draw request must be from the borrowing entity and will be disbursed only to the borrowing entity bank account supplied.

*Id.* at Ex D.

In April 2023, Plaintiffs submitted their first draw request, together with an invoice from Kapotas Construction and a bill from an architect. *See id.* at ¶¶ 14-15a. Based upon this initial submission, Defendant determined additional invoices were necessary to accommodate the request. *See id.* at ¶ 20. Shortly thereafter, Plaintiffs submitted receipts for materials used for work performed corresponding to the first draw request. *See id.* at ¶ 20a. Only after Plaintiffs submitted receipts for these materials, did Defendant accommodate a portion of the request. *See id.* Defendant

---

[2]    The Court understands it to be incumbent on the borrower, in this case Plaintiffs, to engage a property inspector satisfactory to the lender to ensure that the budgeted rehab work has been completed. However, this apparent technical misstatement is of no moment.

also informed Plaintiffs that draw requests would not be approved for invoices a borrower pays to themselves or their company for labor by the borrower or the borrower's company. *See id*. at ¶¶ 53, 55. Defendant released $24,197 – only a portion of Plaintiffs' first draw request. *See id*. at ¶ 21. According to Defendant, this amount covered the work actually completed on the Property. *See id*. at ¶ 21.

After Defendant denied the balance of Plaintiffs draw request for non-compliance with the Guidelines, Plaintiffs cancelled their June 2023 mortgage payment, intentionally defaulting on the Loan. *See id*. at ¶ 24. Despite receiving $430,734.78 from Defendant, Plaintiffs never made a single payment on the Loan. *See id*. at ¶ 25. Defendants initiated a foreclosure action against Plaintiffs on November 17, 2023. *See id*. at ¶ 33. On November 29, 2023, Plaintiffs commenced this action with the filing of a Writ of Summons in the Philadelphia County Court of Common Pleas. *See id*. at ¶ 34. Plaintiffs then filed a Complaint on April 9, 2024. *See id*. at ¶ 35.

Plaintiffs' Complaint asserts the following six claims: breach of contract (Count I), promissory estoppel (Count II), negligent misrepresentation (Count III), breach of fiduciary duty (Count IV), rescission (Count V), and declaratory judgment (Count VI). *See id*. at ¶ 36. Defendant removed the State Court Action to the District Court for Eastern District of Pennsylvania. *See id*. at ¶ 37. On January 10, 2025, Defendant filed its Motion for Summary Judgment. Plaintiffs' Memorandum in Opposition to

Defendant's Motion is docketed at Dkt. 33.[3]  Defendant's Motion is now ripe for consideration.

## III.    LEGAL STANDARDS

Summary judgment is appropriate "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to [ ] judgment as a matter of law." *Mann v. Palmerton Area School District*, 872 F.3d 165, 170 (3d Cir. 2017) (citation and internal quotation marks omitted).  A fact is "material" if, under the applicable substantive law, it is essential to the proper disposition of the claims.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Id.*

The party moving for summary judgment under Rule 56 "bears the burden of demonstrating the absence of any genuine issues of material fact.  When determining whether there is a triable dispute of material fact, the court draws all inferences in favor of the non-moving party."  *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820-821 (3d Cir. 2006) (citations and internal quotation marks omitted).

The movant's initial burden does not relieve complainant's obligation of producing evidence that would support a jury verdict.  *Anderson*, 477 U.S. at 256.

---

[3]    Initially, this Court issued an order granting Defendant's Motion.  *See* Dkt. 32. At that juncture, Plaintiffs had not timely responded to the Motion.  Plaintiffs have since filed Motion for Reconsideration and that Motion has been granted.  *See* Dkt. 34.

Because a motion for summary judgment looks beyond the pleadings, the opposing party must advance specific facts showing that there is a genuine factual dispute. *See Marshall v. Sisters of Holy Family of Nazareth*, 399 F.Supp.2d 597, 598 (E.D. Pa. 2005). The non-movant may not rest on their pleadings but must point to probative evidence tending to support the complaint. *Anderson*, 477 U.S. at 256. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. If the "evidence presented by the non-movant is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-250.

## IV.    DISCUSSION

### a.  Plaintiffs' Breach of Contract Claim Fails

Plaintiffs allege that once the parties closed on the Loan, Defendants were obligated to disperse the funds, and no provision of the Mortgage permitted Defendant to withhold funds. *See* Pls.' Mem. in Opp'n at 17 (Dkt. 33). Confusingly, Plaintiffs further argue that their ability to draw on the funds withheld as part of the Loan is not a part of an express written agreement, but rather a compilation of communications by and between the parties. *See id.* at 17-18. Plaintiffs' argument follows that the unwritten course of conduct or understanding that make up the agreement is an issue for the factfinder. *See id.* Plaintiffs' own position conflicts with itself: in one instance Plaintiffs allege that all funds should have been released with

the closing of the Loan, but in the next instance, Plaintiffs seemingly concede that a portion of the funds were to be withheld by Defendant upon closing.

Defendant argues that Plaintiffs were required to follow the draw process fully contained and outlined in the Rehab Budget and Rehab Draw Guidelines.  *See* Def.'s Mem. in Supp. at 7-8 (Dkt. 29-1).  Defendants further argue that Plaintiffs' course of conduct in requesting the draws was inconsistent with the Guidelines, and therefore Defendants were not required to honor the parts of the request it determined were incomplete or unverified.  *See id.* at 8-9.

Under Pennsylvania law, a plaintiff must establish the following to satisfy a claim for breach of contract: "(1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages." *Saltzman v. TD Bank, N.A.*, No. CIV.A. 10-3265, 2011 WL 1193112, at *8 (E.D. Pa. Mar. 29, 2011) (*citing Omicron Sys. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. 2004)). When interpreting a contract, a court's primary objective is to determine the parties' objective intent at the time of contract formation.  *See Mellon Bank, N.A., v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980).

In this case, there was a written agreement between the parties.  "The strongest external sign of agreement between contracting parties is the words they use in their written contract."  *Id.*  Thus, "a court will make no inference or give any construction to the terms of a written contract that may be in conflict with the clearly expressed language of the [contract]."  *National Cash Register Co. v. Modern Transfer Co., Inc.*, 302 A.2d 486, 488 (Pa. Super. 1973).  A court may not construe a contract

in way that modifies the plain meaning of its words.  *See Best v. Realty Management Corp.*, 101 A.2d 438, 440 (Pa. Super. 1953).  As a result, "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone."  *East Crossroads Center, Inc. v. Mellon-Stuart Co.*, 205 A.2d 865, 866 (Pa. 1965).

The Mortgage and associated Loan documents create an enforceable agreement, which expressly discuss the withholding of funds.  Therefore, this is an issue of contract interpretation, which is a question of law for the Court.  *See Melon Bank, N.A.*, 619 F.2d at 1011 n.10. (unambiguous writings are interpreted by the court as a question of law).  During the Loan application process, Plaintiffs acknowledged and signed the Rehab Budget and Rehab Draw Guidelines.  The Rehab Draw Guidelines state the "Draw Process" as follows:

> [i]n order to fund renovation draws . . . [Defendant] will engage a property inspector . . . to ensure that the budgeted rehab work has been completed prior to releasing the funds. . . . The borrower must complete a draw request . . . and supply invoices for the line item that the draw is to cover.  [Defendant] will compare the draw request and invoices against the inspection report form to confirm that work has been completed for the requested draw.

Dkt. 30-4 at 3.  This clearly explains what the Defendant requires of each draw request.  Further, this process is consolidated to a list included in the protocol Plaintiffs signed on March 18, 2023.  The list for the "Draw Request Steps" is as follows:

> Using the Scope of Work Budget, list the amount requested for each line item being reimbursed.
> Submit Paid Invoices documenting the work completed[.]
> Confirm contact for Inspector to set appointment to meet the project[.]
> Inspector completes inspection report and submits to [CTP] for review[.]

[CTP] issues draw and ACH's the funds into the borrower['s bank account[.]

Dkt. 30-4 at 4.

Plaintiffs were on clear notice of the procedure both from the Guidelines and the protocol they signed and still failed to adhere.  Plaintiffs attempted to supplement their draw request by submitting paid invoices.  *See* Dkt. 1-2 at Ex. F.  However, there are several line items of the invoices that do not comply with Defendant's draw request requirements.  *See id*.  Plaintiffs submitted a draw request for incomplete work and wanted to submit their own photos in lieu of the required photo verification from the inspector.  *See id*.  Plaintiffs' own email communications acknowledge the flaws in their draw request, essentially addressing why certain items did not satisfy the draw request requirements:

Please note:

Item 5, Siding. This is installed, but unfortunately the inspector didn't make it back to that area, which is behind the garage. We are happy to send a photo to you and the inspector if that will be sufficient.

. . .

Item 6, Fire Sprinklers-Smoke detectors..., the inspector has approved $9000 for the fire alarm system[,] which is completely installed and includes the smoke detectors, horns and pulls. The remaining $21,000 is for the sprinkler system which has not yet been installed.

. . .

Finally, as the inspector mentioned, the washer/dryers had been delivered during his inspection. These will be installed by Monday. In the interest of time and to avoid waiting until the next inspection, could we send you a photo of the installed washer/dryers to allow for the release of these funds?

*Id.*

Separately, Plaintiffs argue that Defendant breached the contract by rejecting invoices from Kapotas Construction. This argument mischaracterizes Defendant's position with respect to the invoices. Defendant *did* accept invoices from Kapotas Construction as general contractor. However, it only released funds for the items contained in the rehab budget where Plaintiffs correctly followed the draw procedures. *See* Dkt. 30-7 at Ex. G.[4]

Additionally, Plaintiffs inaccurately allege that Defendant's pre-closing communications create a duty of good faith and fair dealing that Defendant breached when they did not accept invoices from Plaintiffs' construction company for draw requests. *See* Pls.' Mem. in Opp'n at 21.

> Pennsylvania law recognizes the general duty of good faith and fair dealing.
>
> Section 205 of the Restatement (Second) of Contracts suggests that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." A similar requirement has been imposed upon contracts within the Uniform Commercial Code by 13 Pa.C.S. § 1203. The duty of "good faith" has been defined as "honesty in fact in the conduct or transaction concerned." *See* 13 Pa.C.S. §1201.

*Creeger Brick and Bldg. Supply Inc. v. Mid-State Bank and Trust Co.*, 560 A.2d 151, 153 (Pa. Super. 1989) (cleaned up). The Pennsylvania Supreme Court has refused "to

---

[4]    In response to Plaintiffs' draw request, Defendant did release $24,197. *See* Dkt. 30-7 at Ex. G. Plaintiffs contend that the inspector reports indicate the cost of work completed and verified was much more than the released amount. *See* Dkt. 30 at ¶ 21a; *see also* Dkt. 30-19 at Ex. 4; Dkt. 30-20 at Ex. 5. However, inspector verification is only one of the draw request requirements. For Defendant to release funds, Plaintiffs needed to follow all of the steps.

impose a duty of good faith which would modify or defeat the legal rights of a creditor." *Id.* A lender does not violate a separate duty of good faith when it adheres to it agreement or has negotiated terms favorable to itself. *See id.* at 36-37.

As previously stated, Defendant was entitled, per the express terms of the Rehab Draw Guidelines, to only disburse those funds that fully complied with the written agreement. Thus, Defendant did not violate a duty of good faith and fair dealing when they denied Plaintiffs' request for funds that were not in full compliance with the draw request policy.

In sum, Defendant did not breach the contract in denying release of the requested funds. Defendant was well within the bounds of the contract when it refused to comply with draw requests inconsistent with the draw process. Therefore, Defendant's Motion is granted as to Count I.

### b. Plaintiffs' Promissory Estoppel Claim Fails

Plaintiffs allege that the doctrine of promissory estoppel should work to prevent Defendant from benefitting from its misleading communications regarding the draw process. *See* Pls.' Mem. in Opp'n at 26. Defendant argues that the promissory estoppel claims should fail because the Mortgage and the associated Loan documents govern the agreement between the parties. *See* Def.'s Mem. in Supp. at 11.

Promissory estoppel is an equitable doctrine that "makes otherwise unenforceable agreements binding." *Wilmington Tr., Nat'l Ass'n as Tr. for Registered Holders of RBS Com. Funding, Inc., Com. Mortg. Pass-Through Certificates, Series*

*2014-C21 v. Cedar Crest Pro. Park VII LP*, No. 5:24-CV-04627-JMG, 2025 WL
1618146, at *5 (E.D. Pa. June 6, 2025) (Gallagher, J.) (internal quotation marks and
citations omitted).  To state a claim for promissory estoppel, a plaintiff must establish
the following:

> (1) the promisor made a promise that he should have reasonably
> expected to induce action or forbearance on the part of the promisee; (2)
> the promisee actually took action or refrained from taking action in
> reliance on the promise; and (3) injustice can be avoided only by
> enforcing the promise.

*Id.* (internal quotation marks and citations omitted).  Under Pennsylvania law, relief
for promissory estoppel will not be granted when the alleged promise "contradicts,
modifies, or supplements an enforceable contract." *Atul K. Amin Fam. Ltd. P'ship v.
Steward Easton Hosp., Inc.*, No. 5: -CV-04161-JMG, 2021 WL 2012509, at *5 (E.D.
Pa. May 19, 2021) (Gallagher, J.) (internal quotation marks and citations omitted).
However, "if this Court were to find that the promises upon which Plaintiff based its
claim for promissory estoppel were separate and distinct from the substance of the
contract, Pennsylvania law would not preclude Plaintiff's claim." *W. Chester Univ.
Found. v. MetLife Ins. Co. of Conn.*, 259 F. Supp. 3d 211, 223 (E.D. Pa. 2017).

Here, the entirety of the enforceable agreement is contained in the Mortgage
and associated Loan documents.  Further, the communications on which the
Plaintiffs premise this claim are not separate and distinct from the substance of the
Mortgage and associated Loan documents.  Plaintiffs do not point to any specific
promises made by Defendant that are not already contemplated by the terms of the
contract.  Essentially, Plaintiffs advance their promissory estoppel argument in the

alternative and point to nothing in the record that supports any facts in dispute. Accordingly, Defendant's Motion as to Count II is granted.

### c. Plaintiffs' Breach of Fiduciary Duty Claim Fails

Plaintiffs allege their borrower-lender relationship with Defendant is one of special circumstance where a fiduciary relationship exists. Plaintiffs equate this situation to that of the Pennsylvania Superior Court opinion in *Garbish v. Malvern Federal Sav. And Loan Ass'n*, 517 A.3d 547 (Pa. Super. 1986).[5] Plaintiffs allege that Defendant, like the lender in *Garbish*, "imposed its complete control and discretionary use of the construction funds upon [borrowers] outside of the bounds of an express, written agreement such that a special relationship must be found to have been created, giving to a fiduciary duty." Pls.' Mem. in Opp'n at 8.

To prevail on a breach of fiduciary duty claim, a plaintiff must first establish the existence of a fiduciary relationship between the parties. *See Wilmington*, 2025 WL 1618146 at *5. A plaintiff must then show that "the defendant negligently or intentionally failed to act in good faith and solely for the plaintiff's benefit, and that

---

[5]    In *Garbish*, while negotiating a mortgage, the lenders informed the borrowers that for construction loans, they used a voucher system to administer the construction fund. *See Garbish v. Malvern Federal Sav. And Loan Ass'n*, 517 A.3d 547, 549. The contractor performing the construction would submit vouchers to the lenders for work that was completed, and the lenders would subsequently verify the voucher and release the funds. *See id*. The borrowers requested to participate in the voucher system and to co-sign the vouchers before funds were distributed. *See id*. The lenders denied this request, stating it was contrary to their policy and that they were an "expert in the disbursement of construction fund money." *Id*. This left the borrowers without any knowledge of how their loan was being distributed. *See id*.

the plaintiff suffered an injury caused by the defendant's breach of fiduciary duty." *Id*. (citation and internal quotation marks omitted).

Pennsylvania law follows the well-established principle that a lender does not owe a borrower a fiduciary duty. *See Grace v. Moll*, 132 A. 171, 171 (Pa. 1926). "This principle stems from the presumption that the relationship between lenders and borrowers is conducted at arms-length and the parties are each acting in their own interest." *Temp-Way Corp. v. Cont'l Bank*, 139 B.R. 299, 318 (E.D. Pa. 1992). Although a fiduciary relationship between a lender and borrower does not ordinarily exist, "[one] may arise if a lender has substantial control over a borrower's business affairs." *Id*. A lender has substantial control over a borrower when evidence supports that the lender was involved in the borrower's day-to-day management and operations, or the lender had the ability to influence the borrower into making unusual transactions. *See Wilmington*, 2025 WL 1618146 at *5.

Plaintiffs fail to acknowledge that, distinct from *Garbish*, Plaintiffs participated in the distribution of the construction funds. Plaintiff Petros Kapotas, as the borrower, performed the work on the Property and submitted draw requests to Defendant. When lenders and borrowers jointly participate in the disbursement of construction funds, the lender does not have complete control, and a fiduciary relationship does not exist. *See Garbish*, 517 A.3d at 553. Thus, for the reasons explained above, Plaintiffs have failed to establish a fiduciary duty in the first instance. Accordingly, Defendant's Motion for summary judgment as to Count IV is granted.

14

### d. Plaintiffs' Negligent Misrepresentation Claim Fails

Plaintiffs allege Defendant owed them a fiduciary duty by way of a fiduciary relationship. As discussed above, there is no fiduciary relationship between the parties. Separately, Plaintiffs allege that even if a fiduciary relationship did not exist, Defendant still had a duty to provide Plaintiffs with complete and accurate information regarding the draw process. Accordingly, Plaintiffs contend that Defendant did not fulfill this duty and provided false information as to the draw requests, which Plaintiffs relied on to their detriment. *See* Pls.' Mem. in Opp'n at 10-11. Defendant asserts that Plaintiffs cannot establish a *prima facia* case for negligent misrepresentation. Defendant further argues that claims sounding in tort law are barred by the gist of the action and economic loss doctrines. *See* Def.'s Mem. in Supp. at 12-13.

The draw request process required for reimbursement of funds was clearly established in the Rehab Draw Guidelines. *See* Dkt. 30-4 at 3. Even assuming arguendo it was not, Plaintiffs claims for negligent misrepresentation fail. To establish a claim for negligent misrepresentation under Pennsylvania law, a party must show proof of:

> (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.

*Bortz v. Noon*, 729 A.2d 555, 561 (Pa 1999) (*citing* Restatement (Second) Torts § 552). Additionally, like any other negligence action, negligent misrepresentation requires the existence of a duty owed by one party to another. *See id*.

"Under Pennsylvania law, the gist of the action doctrine prevents a purely contractual duty from serving as the basis for a tort claim." *Zaftr Inc. v. Lawrence*, No. CV 21-2177, 2023 WL 349256, at *21 (E.D. Pa. Jan. 20, 2023) (Beetlestone, J.); *see also Bruno v. Erie Ins. Co.*, 106 A.3d 48, 65 (Pa. 2014)). This doctrine precludes a plaintiff from transforming an ordinary contract claim into a tort claim. *See Zaftr*, 2023 WL 349256, at *21. Whether the gist of the action doctrine applies to a particular circumstance is a question of law for the court. *See id*.

> When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the gist . . . of it sounds in contract or tort; a tort claim is maintainable only if the contract is collateral to conduct that is primarily tortious.

*Wilmington Fin., Inc. v. Am. One Fin., Inc.*, No. CIV.A. 06-5559, 2007 WL 2221424, at *2 (E.D. Pa. July 31, 2007) (Baylson, J.) (internal citations and quotation marks omitted). Pennsylvania courts have established four scenarios where the gist of the action doctrine bars a tort claim:

> (1) where liability arises solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

*Star v. Rosenthal*, 884 F. Supp. 2d 319, 328–29 (E.D. Pa. 2012) (*citing Sarsfield v. Citimortgage, Inc.*, 707 F. Supp. 2d. 546, 553 (M.D. Pa. 2010)).

Plaintiffs allege Defendant misrepresented material information regarding the draw process, breaching their duty to provide clear and accurate information. However, Plaintiffs' negligent misrepresentation claim is independently barred by each of the scenarios described above. Liability between the Plaintiffs and Defendant arise solely from their contractual relationship created by the Mortgage, the duty regarding the draw process is directly addressed in the Settlement Statement of the contract, any potential liability for the Defendant could only arise from the contract, and this claim is essentially a duplicate of the Plaintiffs' breach of contract claim discussed above.

In the alternative, this claim is barred by the economic loss doctrine. Pennsylvania's economic loss doctrine provides that a cause of action for negligence does not exist when it "results solely in economic damages unaccompanied by physical or property damage." *Azur v. Chase Bank, USA, Nat. Ass'n*, 601 F.3d 212, 222 (3d Cir. 2010) (internal citations and quotation marks omitted). The doctrine is concerned primarily with "foreseeability and limitation on liability." *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 175 (3d Cir. 2008). The Pennsylvania Superior Court discussed these concerns, and explained that

> allow[ing] a cause of action for negligent cause of purely economic loss would be to open the door to every person in the economic chain of the negligent person or business to bring a cause of action. Such an outstanding burden is clearly inappropriate and a danger to our economic system.

*Aikens v. Baltimore & Ohio R.R. Co.*, 501 A.2d 277, 279 (Pa. Super. 1985).

The Pennsylvania Supreme Court carved out an exception to this doctrine by formally adopting Section 552 of the Restatement (Second) of Torts, which governs negligent misrepresentation.  *See Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 286 (Pa. 2005).

> Section 552 sets forth the parameters of a duty owed when one supplies information to others, for one's own pecuniary gain, where one intends or knows that the information will be used by others in the course of their own business activities.  The tort is narrowly tailored, as it applies only to those businesses which provide services and/or information that they know will be relied upon by third parties in their business endeavors, and it includes a foreseeability requirement, thereby reasonably restricting the class of potential plaintiffs.

*Id*. at 285-286.

Plaintiffs allege this exception should apply to Defendant.  However, Plaintiffs misinterpret the application of the *Bilt-Rite* exception.  As an initial matter, the *Bilt-Rite* exception typically involves a third party who lacks privity with the supplier of the information.  *See id*. at 286.  Plaintiffs here are in privity with the Defendant and thus, are not a third party to the contract.  Further, the exception applies to "cases where information is negligently supplied by one *in the business of supplying information*[.]" *Fleming Steel Co. v. Jacobs Eng'g Grp., Inc.*, 373 F. Supp. 3d 567, 596 (W.D. Pa. 2019) (emphasis added) (*quoting Bilt-Rite*, 866 A.2d at 287).

As a lender, Defendant's business is not one of supplying information akin to the "design professionals" discussed in *Bilt-Rite* and preceding cases.  *See Bilt-Rite*, 866 A.2d at 286; *see also Fleming*, 373 F. Supp. 3d at 601 (stating that information supplied must be a professional representation made by a design profession, similar to an architect and "[t]he mere fact that a supplier of information stands to gain

financially from a transaction in which it has a pecuniary interest is not enough to bring the negligent misrepresentation claim within the *Bilt-Rite* exception.").

As a result, the economic loss doctrine bars Plaintiffs' negligent misrepresentation claim; Plaintiffs' economic damages are unaccompanied by physical or property damage, and the *Bilt-Rite* exception does not apply. Therefore, this Court grants Defendant's Motion as to Count III.

### e. Plaintiffs' Rescission Claim Fails

Plaintiffs allege they are entitled to rescission because of Defendant's actions and misrepresentation regarding the general contractor approval process. *See* Pls.' Mem. in Opp'n at 24. Defendant contends Plaintiffs are not entitled to rescind the mortgage because Plaintiffs did not restore or tender a return of funds that were released by Defendant under the Mortgage. *See* Def.'s Mem. in Supp. at 19. In support of their position, Defendants cite a case governed by the Truth in Lending Act ("TILA"). *See In re Porter*, 961 F.2d 1066 (3d Cir. 1992); *see also* Def.'s Mem. in Supp. at 18. However, because the loan here is being used for a business purpose, it is exempt from the TILA. *See* 15 U.S.C.A § 1603. Accordingly, the analysis in *In re Porter* differs slightly than the Court's analysis here and Undersigned rejects Plaintiffs' claim for rescission through its own independent analysis.

Pennsylvania courts have long upheld the equitable right of rescission. "Rescission is the unmaking or annulment of a contract." *Lavecchia v. Fleming*, 669 F. Supp. 3d 342, 347 (E.D. Pa. Jan. 9, 2023) (Bartle, J.). To succeed on a claim for rescission, a plaintiff must establish a material misrepresentation and reliance. *See*

*id.* at 347.  Additionally, a plaintiff must also show that "parties can be restored as nearly as possible to their original positions with regard to the subject matter of the contract."  *Id.* at 348.  This Court does not find that Defendant made a material misrepresentation; there is no evidence to indicate Defendant represented anything contrary to what was included in the Rehab Draw Guidelines.  Even if this Court did find a material misrepresentation, parties would be incapable of returning to their original positions.

Plaintiffs contracted for a mortgage of $576,500.  $406,537.78 was released at the Loan's closing to pay off an existing loan, while $131,500.00 was withheld by Defendant and was to be released upon completion of satisfactory draw requests by Plaintiffs.  Plaintiffs already used some of the remainder of the Loan to fund renovations made to the Property.  If this Court rescinded the Mortgage, Plaintiffs would obtain the Property in an improved condition as compared to its initial condition at settlement.  This creates a situation where it is practically impossible for the parties to return to their original positions as the Property has significantly changed.  *See Lavecchia* at 350-51 (holding that plaintiffs would be unable to rescind their contract because after discovering issues with their newly purchased home, they opted to upgrade the house rather than try to maintain the status quo).

In light of the fact that Plaintiffs have never made a payment on the Mortgage, this Court is skeptical that Plaintiffs would even be able to pay back the Loan to the Defendant, clearly preventing Defendant from being able to return to its original

position.[6]  Consequently, for the reasons just discussed, this Court finds that the Plaintiffs did not provide sufficient evidence to establish a claim for rescission, and grant Defendant's Motion as to Count V.

### f.  Plaintiffs' Declaratory Judgment Claim Fails

Plaintiffs allege that because Defendant did not consider the *Reifer* factors, Defendant failed to provide sufficient analysis of whether this Court should issue a declaratory judgment.  *See* Pls.' Mem. in Opp'n at 25-26 (*citing Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 134 (3d Cir. 2014).  In response, Defendant observes that declaratory judgment is a remedy – not a separate cause of action.  Defendant further observes that this claim is subsumed in the Plaintiffs' recission claim.  *See* Def.'s Mem. in Supp. at 21.

The Declaratory Judgment Act (DJA) provides:

"[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

28 U.S.C. § 2201(a).  The Court uses declaratory judgment to "declare the rights of litigants."  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995).  Declaratory judgments must "have utility and be of significant help in ending the controversy."  *Baum v. Schlesinger*, No. 2:21-cv-944, 2022 WL 3716682 at *5 (W.D. Pa. May 26, 2022) (*citing*

---

[6]  By Persefoni Kapotas' own words, Plaintiffs were left "depleted" of their resources by the foreclosure of the Property: "the market tanked" and Plaintiffs "lost potential rents," "lost credit," and lost "a main source of [their] income."  Dkt. 30-14 at 28-29.

*Step-Saver Data Sys. v. Wyse Tech.*, 912 F.2d 643, 650 (3d Cir. 1990)) (internal quotation marks omitted).  The Third Circuit adopted the *Riefer* factors for district courts to use as a guide when determining whether to exercise DJA jurisdiction.  *See Reifer*, 751 F.3d at 145-146 (3d Cir. 2014).[7]  "These factors are non-exhaustive, and there will be situations in which district courts must consult and address other relevant case law or considerations."  *Id*. at 146.

That said, "the Third Circuit urges courts to exercise their discretion to decline proceeding with declaratory judgments when they duplicate other claims."  *Baum*, 2022 WL 3716682 at *5 (*citing State Auto Insurance Company v. Summy*, 234 F.3d 131, 134 (3d Cir. 2000)).  Based on that instruction, district courts in the Third Circuit regularly decline grants for declaratory judgment *solely* on the basis that a declaratory judgment claim is duplicative of another claim.  *See In re Wawa, Inc. Data*

---

[7]    The eight *Reifer* factors are:

> (1) the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy;
> (2) the convenience of the parties;
> (3) the public interest in settlement of the uncertainty of obligation;
> (4) the availability and relative convenience of other remedies;
> (5) a general policy of restraint when the same issues are pending in a state court;
> (6) avoidance of duplicative litigation;
> (7) prevention of the use of the declaratory action as a method of procedural fencing or as a means to provide another forum in a race for *res judicata;* and
> (8) (in the insurance context), an inherent conflict of interest between an insurer's duty to defend in a state court and its attempt to characterize that suit in federal court as falling within the scope of a policy exclusion.

*Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 146 (3d Cir. 2014).

*Sec. Litig.*, No. CV 19-6019, 2021 WL 1818494, at *8 (E.D. Pa. May 6, 2021); *see also Butta v. GEICO Cas. Co.*, 400 F. Supp 3d 225, 233 (E.D. Pa. 2019) (Kearney, J.) ("Courts generally decline granting declaratory relief when the claim for declaratory judgment is entirely duplicative of another claim in the cause of action."); *see also Sigel v. Goldstein*, 657 F. Supp. 3d 646, 662 (E.D. Pa. Feb. 21, 2023) (Beetlestone, J.) ("Declaratory judgments are generally inappropriate when they duplicate other claims.").

This Court agrees with the Defendant's analysis of the duplicative nature of this claim. The majority of the allegations set forth in the Plaintiffs' request for declaratory judgment are previously alleged in their rescission claim (Count V). Accordingly, this Court has discretion to reject Plaintiffs declaratory judgment claim due to its repetitive nature. *See Baum*, 2022 WL 3716682 at * 7. Therefore, Defendant's Motion as to Count VI is dismissed.

## V.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted in its entirety and Plaintiffs' Complaint is dismissed, with prejudice.

BY THE COURT:

GAIL A. WEILHEIMER    J.

23